# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

Allstate Insurance Company,

|  |  |
|---|---|
| Cross-Plaintiff, | Case No. 16-cv-12473 |
| v. | Judith E. Levy<br>United States District Judge |
| Everest National Insurance Company, | Mag. Judge Elizabeth A. Stafford |
| Cross-Defendant. | |

_____/

## ORDER DENYING CROSS-DEFENDANT EVEREST NATIONAL INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT [24]

This matter is before the Court on cross-defendant Everest National Insurance Company's ("Everest") motion for summary judgment. This is a case in which cross-plaintiff, Allstate Insurance Company ("Allstate"), seeks a declaration that Everest occupies a higher order of priority for payment of an injured non-party individual's ("Bryson") No-Fault benefits under M.C.L. § 500.3114(1). Everest brings a motion for summary judgment asserting that it properly rescinded the

no-fault insurance contract in question and owes no benefits to Bryson at all, and therefore it is entitled to judgment as a matter of law. The Court heard oral argument on May 1, 2018. Following the hearing, the parties were permitted to submit supplemental briefing. (Dkts. 35, 38.) For the reasons set forth more fully below, cross-defendant's motion is denied.

## I. Background

On January 26, 2016, Bryson completed a Michigan Auto Insurance Application in the office of the DAD Agency in Waterford, Michigan. Independent insurance agent Andrea McGhee facilitated the completion of his application. McGhee read the application questions to Bryson from her computer monitor and typed his responses directly into the application. (Dkt. 24-4 at 5.) When McGhee completed the typed application form, she printed a copy of the application and presented it to Bryson for his signature. (*Id.* at 6.) After having the opportunity to read the application in its entirety, Bryson signed the "Applicant's Statement," the online recurring payment agreement, and a statement declining collision coverage. (*Id.*; *see also* Dkt. 24-2 at 5–7.)

One of the questions in the insurance application – and the question that is of particular relevance to the dispute between Allstate and

Everest – relates to other "household members." (Dkt. 24-2 at 2.) The application states:

> DRIVER INFORMATION NOTE: All household members age 14 or older, including but not limited to spouse(s), roommate(s), children, family members and wards must be listed as potential drivers. In addition, all individuals outside the household and any drivers to whom the insured auto(s) [*sic*] is furnished or available for his or her use, even occasionally, and/or infrequently, must be identified and listed below. Your total policy premium can be affected by this information.

Below the statement is a grid requesting, along with other information: "Full Name of All Drivers (As Appear on License)… Years Licensed… Drivers [*sic*] License Number" for the applicant and each individual that the applicant determines falls into the category described in the previous paragraph. (*Id.*)

On the date that Bryson applied for the insurance coverage, he lived in a trailer home with two other individuals, Michael Smith and Zach Marsh. (Dkt. 24-4 at 4.) The three of them moved into the unit together in October 2015. (*Id.*) According to Bryson, neither Mr. Smith nor Mr. Marsh moved into the unit with a vehicle, and to Bryson's knowledge, neither had a driver's license. (*Id.*)

Bryson testified that he does not remember precisely how the question related to household members was posed to him. (Dkt. 24-4 at 5.) He "think[s] [McGhee] asked if [he] lived with any other drivers, and [he] said no." (*Id.*) Bryson also confirmed that "[i]f [McGhee] had asked [him] about other residents in the household that were age 14 or older," he would have "absolutely" told her about them. (*Id.*)

McGhee's deposition testimony is consistent with Bryson's recollection. She stated that she, as a general practice, "does not read" the Driver Information Note to applicants and instead she goes directly "into the questions." (Dkt. 24-11 at 14.) She stated that when she asks the question about household members, she "ask[s] for everybody over the age of 14." (*Id.* at 15.) She confirmed that when she asked the question of Bryson, he and his father[1] acknowledged that there were other adults who lived with him, but "they have nothing to do with [Bryson.]" (*Id.*) McGhee confirms that she said "okay" and did not list any other adults on the insurance application. (*Id.* at 16.) Additionally, the "YES" box was checked in response to the question "Have you identified on this

---

[1] Bryson states in his deposition testimony that his mother drove him to the insurance agency, and that he went in to meet with McGhee alone. This inconsistency does not change any of the forthcoming analysis.

application all members of your household who are over the age of 14?"[2]

(Dkt. 24-2 at 5.)

Finally, the "Applicant's Statement" which was included in the printed copy of the application that Bryson signed, included the following language:

> **APPLICANT'S STATEMENT – READ BEFORE SIGNING.** [. . .] I certify that all household members age 14 or older, including but not limited to spouse(s), roommate(s), children, family members and wards have been listed as potential drivers. [. . .]

(Dkt. 24-2 at 5.) Bryson confirms that he had the opportunity to review the document before signing it, and that the signature on the form is his. (Dkt. 24-4 at 6–7.) He states that McGhee explained to him what the documents meant, he said "okay," and signed the forms. (*Id.* at 7.)

McGhee testified in her deposition that in approximately December 2015 or January 2016, two individuals from Everest Insurance visited

---

[2] It is not possible to check the "NO" box in response to this question. Instead of a box to check in the "NO" column, the word "Unacceptable" is printed. (Dkt. 24-2 at 5.) Paul Serota, an underwriter for Everest, stated in his deposition that the system will not let you proceed through the application until the "YES" box is checked. (Dkt. 24-5 at 10.) He states that every person in the household over the age of 14 must be identified, and then either be added to or excluded from the policy. (*Id.*) The Court was unable to identify a place in the application where an applicant would list an excluded driver.

her agency. (*Id.* at 20.) She stated that during their visit, she took the opportunity to ask them to clarify what constituted a "member of a household" for the purposes of the insurance application because she thought that the question was vague. (*Id.* at 17–18.) According to McGhee, the Everest representatives told her that she "didn't have to worry about other people in the household" because "they would be their own separate entity at that point." (*Id.* at 19.)

Neither of the individuals (Mr. George Craze and Mr. Todd Drake) testified to having a specific recollection of such a conversation with McGhee. (Dkt. 31-1 at 5; Dkt. 31-2 at 5.) Each said that, if the question had come up, they would have directed McGhee to the underwriting department for clarification. (Dkt. 31-1 at 5; Dkt. 31-2 at 6.) Mr. Paul Serota, Vice-President of Underwriting Operations, confirmed in his deposition that the insurance application itself does not contain a definition of "household" (Dkt. 24-5 at 10) and that the "Underwriting Manual" states only that "all persons, including the named insured's spouse, all additional household members aged 15 and older and any additional relatives or other persons who occasionally have custody or

control of any listed vehicle must be listed as a driver." (*Id.* at 7–8; *see also* Dkt. 24-14 at 11.)

Upon completing and signing the application, Bryson was issued a no-fault insurance policy. (Dkt. 28-5 at 10.) He made timely payments of his premiums, and the policy was in effect when he was severely injured in an accident while riding as a passenger in his father's vehicle on February 6, 2016. (Dkt. 24-1.)

Under Michigan's No-Fault Law, M.C.L § 500.3114(1), Bryson's policy through Everest (as the policy issued to the injured claimant) is higher in the order of priority than the Allstate policy held by Bryson's father (the owner of the vehicle involved in the collision) for the payment of insurance benefits. (Dkt. 28 at 8.) Everest, however, contends that Bryson's failure to list his roommates on his application – and more particularly his failure to either add or exclude them from his policy – constitutes a "material misrepresentation" giving it grounds to rescind his policy.

Indeed, following an internal investigation, on April 7, 2016 Everest rescinded Bryson's Personal Auto Policy. (Dkt. 24-6.) The letter confirming the rescission stated that it took the action because of

"material misrepresentations, misstatements, omissions, [and/or . . .] in completing and/or supplying information for the completion of the Michigan Auto Insurance Application . . . that was the basis for the issuance of the policy." (*Id.* at 2.) Included with the rescission letter was a check for $686.08, which represented the amount paid for the policy for the period it was in effect. (*Id.*) On April 15, 2016 Everest sent Bryson a second letter confirming its denial of coverage for Bryson's accident declaring that it had "rescinded the Everest Policy, declaring it null and void, effective as of its January 26, 2016 inception date." (Dkt. 24-12 at 2.)

Everest's decision to rescind the policy was based on an internal investigation that took place immediately following the accident. The claim investigator interviewed Bryson while he was still in the hospital. (Dkt. 24-3 at 6.) In the recorded interview, Bryson confirmed his address and the fact that he lived with two roommates. (*Id.*) The investigator conducted a "cold call" at Bryson's home and ultimately spoke with both roommates. (*Id.* at 5.) The investigator's report does not confirm whether Mr. Marsh or Mr. Smith are licensed drivers; it states only that both gentlemen "refused" to produce their identification. (Dkt. 24-3 at 5.) The

report also states that "Mr. Smith indicated he had no vehicle, but [Mr. Marsh] drives a 2011 Ford F 250."[3] (*Id.*)

The investigator's report concludes with the following statement: "It appears the claimant failed to disclose the additional residents and vehicles. It appears by adding Michael Smith there would be no additional premium increase. But by adding Zachary Marsh would increase the premium by $403.00." (Dkt. 24-3 at 9.)

Underwriter Paul Serota was questioned about the investigator's report – in particular, the changes to the insurance policy that would have been issued to Bryson had the roommates been disclosed in the application – at his deposition. The relevant testimony is copied in its entirety below:

> Q: If the applicant had indicated that there were two other people over fourteen in the household, what would Everest or Arrowhead have done with the application?
> A: If there were other residents of the household over fourteen, those individuals would either need to be listed as active drivers or excluded on the policy.

---

[3] Bryson's deposition testimony does not clarify whether either individual maintained a vehicle on the date that he purchased insurance – only that neither one of them "br[ought] any sort of a motor vehicle with them when they moved in." (Dkt. 24-4 at 4.) In addition, Bryson stated in his deposition that "[i]f [McGhee] had asked [if there were] other vehicles garaged in the household," he would have answered "No." (Dkt. 24-4 at 5.)

Q: If they were listed as active drivers, would that have changed the premium quote?

A: I believe it would have.

Q: Fair to say that the premium price would go up?

A: Correct.

. . .

Q: So, as I understand it, if Everest knew about two other people being in the household at the time the application was taken, Everest would not have rejected the application? They would have quoted a higher premium; is that true?

A: If they were listed as active drivers, then we would have quoted the premium based on that information.

Q: And what do you mean by active driver?

A: Again, the insured has the option of either listing somebody as an active driver or excluding them from the policy, and with the exclusion that means that we would not rate the drivers but they would not be allowed to drive the vehicle.

Q: All right. So if the applicant told you I reside with these two other individuals, I want them noted to be excluded drivers, they will not be driving my vehicle, you would still write the policy?

A: Yes, sir.

Q: But obviously at a cheaper premium?

A: It would be the premium without them rated on the policy.

(Dkt. 28-6 at 17, 19–20.) The testimony continues several pages later:

Q: Just so I'm clear, if you had known about these two other individuals that supposedly were in the household of Mr. Bryson when the application was taken, those individuals being Michael Smith and Zachariah Marsh, Arrowhead or Everest would have done one of two things: Written the policy with a larger premium, or two, written a policy with those two individuals written as excluded drivers, is that correct?

A: Yes, sir.

Q: If they were excluded drivers, would the policy premium have remained the same that was quoted to Mr. Bryson initially?

A: It should have remained the same. There's no additional premium for excluding a driver.

(Dkt. 28-6 at 25.)

## II. Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x. 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir. 2002)).

## III. Analysis

The following Michigan statute governs the dispute in this matter:

(1) No misrepresentation shall avoid any contract of insurance or defeat recovery thereunder unless the misrepresentation was material. No misrepresentation shall be deemed material

unless knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make the contract.

(2) A representation is a statement as to past or present fact, made to the insurer by or by the authority of the applicant for insurance or the prospective insured, at or before the making of the insurance contract as an inducement to the making thereof. A misrepresentation is a false representation, and the facts misrepresented are those facts which make the representation false.

Mich. Comp. Laws § 500.2218(1)–(2).

For a party to lawfully rescind an insurance contract, it must demonstrate that there was a "material misrepresentation" in the procurement of the insurance.[4] This requires the rescinding party to prove both that there was a misrepresentation, and that the misrepresentation was material.

The Michigan Supreme Court has held a fact or representation in an application is "material" where communication of it would have had

---

[4] There is a separate, additional body of case law that describes the right of insurers to rescind insurance contracts in the case of fraud in the procurement of insurance. *See, e.g.*, *Titan Ins. Co. v. Hyten*, 491 Mich. 547 (2012). Neither party focuses its argument on the elements of actionable fraud, so they are not analyzed here. To the extent the Court concludes that Everest has not satisfied the standard for summary judgment on the issue of the "materiality" of the misrepresentation, it has also not satisfied the standard for summary judgment on all of the elements of fraud. In particular, there would be – at a minimum – an additional question of fact as to whether Bryson "knowingly" or "recklessly" made a material misrepresentation.

the effect of "substantially increasing the chances of loss insured against[,] so as to bring about a rejection of the risk or the charging of an increased premium." *Oade v. Jackson Nat. Life Ins. Co. of Mich.*, 465 Mich. 244, 253-54 (2001) (quoting *Keys v. Pace*, 358 Mich. 74, 82 (1959)).

Under Michigan law, "it is well settled that a material misrepresentation made in an application for no-fault insurance entitles the insurer to rescind the policy." *Lash v. Allstate Ins. Co.,* 210 Mich. App. 98, 103 (1995). The misrepresentation does not need to be intentional, as "[r]escission is justified in cases of innocent misrepresentation if a party relies upon the misstatement, because otherwise the party responsible for the misstatement would be unjustly enriched if he were not held accountable for his misrepresentation." *Lash*, 210 Mich. App. at 103 (citing *Britton v. Parkin*, 176 Mich. App. 395, 398–99 (1989)).

Everest argues that, in its entirety, its application for insurance is unambiguous in its requirement that an applicant provide the names of and additional information about all household members over the age of 14, including roommates, and that Bryson's failure to list his roommates constitutes a misrepresentation. (Dkt. 24 at 27.) Allstate argues that the application is facially ambiguous because it is internally inconsistent and

vague (Dkt. 28 at 16–17) and that the ambiguities within the application should be interpreted against the drafter. (*Id.* at 17 (citing *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459 (2003)).)

Allstate's strongest argument regarding ambiguity relates to the specific table used to collect information about additional household members. Everest emphasizes the language – highlighting, in particular, the inclusion of the word *roommates* – in the "Driver Information Note" immediately preceding the question that states: "[a]ll household members age 14 or older, including but not limited to spouse(s), roommate(s), children, family members and wards must be listed as potential drivers." Allstate points to the fact that (the language of the introductory language notwithstanding) the space in which the applicant identifies the relevant individuals requires information – including the number of years that each individual has been licensed and the driver's license number of each listed individual – that seems to presume that only *actual drivers* (not hypothetical, potential, or unlicensed ones) would be listed. (Dkt. 28 at 16–17.) Additionally, the Court could not locate any place in the application where an applicant would identify an excluded driver.

If the table requesting information was the *only* portion of the application in question, there would be a closer question regarding the ambiguity of the language of the application. However, the application in its entirety is unambiguous regarding the necessity of listing all household members, including roommates, in the application. The fact that the application system does not allow an applicant to complete the application if the "NO" box is checked in response to the question "Have you identified on this application all members of your household who are over the age of 14?" in combination with the fact that the application concludes with a signature affirming the statement: "I certify that all household members age 14 or older, including but not limited to spouse(s), roommate(s), children, family members and wards have been listed as potential drivers" is particularly persuasive. To the extent that Bryson or McGhee were unsure about the definition of "household" – the final statement unambiguously confirms that roommates are encompassed within the definition.

Accordingly, Bryson's failure to list his roommates, his affirmative answer to the question of whether all members of the household over age 14 were identified, and his signature below a statement that explicitly

stated he had listed all persons over age 14 (including roommate(s)) was a misrepresentation. However, there remains a material question of fact as to whether the misrepresentation itself was *material* as defined under Michigan law.

As an initial matter, Allstate devotes much of its response memorandum to the argument that Everest was not entitled to rescind Bryson's contract because it came to the transaction with "unclean hands." (Allstate argues that Everest representatives gave McGhee bad information about the definition of "household" – and the misrepresentation resulted only because of their improper information.) This argument is without merit. Everest rightly argues that "the unclean hands doctrine cannot be invoked to deny relief in an action at law." (Dkt. 31 at 7 (citing *Rose v. Nat'l Auction Group*, 466 Mich. 453, 467–68 (2002)).) "The equitable action to rescind proceeds on the theory that there has been no rescission and not on the theory that rescission has already been accomplished." *Barke v. Grand Mobile Homes Sales, Inc.,* 6 Mich. App. 386, 390–91 (1967). Everest is not in a court of equity seeking rescission as a remedy. Instead, Allstate commenced this civil action at law, "after Everest [ ] rescinded the policy, returned the policy premium,

and restored Everest and Bryson to the status quo." (*Id.*) The unclean hands doctrine is not applicable to this case.

A misrepresentation on an insurance application is material "if, given the correct information, the insurer would have rejected the risk or charged an increased premium." *Montgomery v. Fidelity & Guar. Life Ins. Co.*, 269 Mich. App. 126, 129 (2005) (citing *Oade*, 465 Mich. at 254). Given the evidence before the Court, there is a material question of fact regarding whether Bryson's failure to list his roommates on his application substantially increased the risk of loss insured against so as to (1) bring about a rejection of the risk, or (2) result in the charging of an increased premium.

Everest insists that Bryson's failure to list his roommates was material. They argue that if Bryson had listed his roommates on his application form, then the policy Everest issued to him would not have been the "same" policy as the one in effect on the date of the accident because he would have been required to list each roommate as either an active or an excluded driver. If he had listed the roommates as active drivers, this would have resulted in a higher premium. If he listed the roommates as excluded drivers, then the policy would have included an

additional term that "specifically excluded" them. Therefore, Everest would not have issued *the* policy that was in effect on the date of the accident.

To support this argument, Everest points to the language of Mich. Comp. Laws. § 500.2218(1), which provides:

> No misrepresentation shall avoid any contract of insurance or defeat recovery thereunder unless the misrepresentation was material. No misrepresentation shall be deemed material unless knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make the contract.

In *Oade v. Jackson National Life Insurance Co. of Michigan*, 465 Mich. 244 (2001), the Michigan Supreme Court confirms that "the plain language of M.C.L. § 500.2218(1) [ ] defines materiality in terms of the insurer's refusal 'to make *the* contract' (emphasis added), not 'a' contract." *Id.* at 254. However, *Oade* continues: "[t]he proper materiality question under the statute is whether 'the' contract issued, *at the specific premium rate agreed upon*, would have been issued notwithstanding the misrepresented facts." *Id.* (emphasis added). To the extent that the Michigan Supreme Court references "the" contract as opposed to "a"

contract – it also affirms that for the insurer to demonstrate materiality, the premium rate must be affected.

In their supplemental brief, Everest emphasizes that under *Oade*, "the focus of inquiry under the statutory 'materiality' test is whether a reasonable underwriter would have regarded [plaintiff's] updated answers . . . as sufficient grounds for *rejecting the risk* or charging an increased premium." (Dkt. 35 at 4 (quoting *Oade*, 465 Mich. at 255 (emphasis added in brief).) Everest argues "had Everest known about Mr. Bryson's roommates . . . , it would not have issued the Policy at all, let alone the same policy." (Dkt. 35 at 7.) The crux of Everest's argument is that if the roommates had been listed as active drivers, the premium unequivocally would have gone up, and that if the policy had been issued with the roommates listed as excluded drivers, this would not have been the *same* policy.

The underwriter's testimony is clear that if Bryson had included his roommates on his insurance application, he would have had to make a choice about whether to include them as active or excluded drivers. (Dkt. 28-6 at 17.) If Bryson's roommates were, in fact, undisclosed active drivers of Bryson's car, then his failure to list them on the insurance

application *was* material because their use of the car exposed the insurance company to an increased risk and would have resulted in a higher premium for Bryson had they been disclosed. This would be grounds for Everest to rescind the policy.

If, instead, Bryson's roommates were undisclosed excluded drivers of Bryson's car, then his failure to include them on the insurance application was *not* material because excluded drivers neither expose the insurance company to an increased risk nor result in a higher premium for the insured. (Dkt. 28-6 at 25 (underwriter Serota confirming that "there's no additional premium for excluding a driver").)

Everest argues that "[a] truthful answer to Question No. 7 (indicating that no, he had not listed all household members over the age of 14) means that the risk is 'unacceptable' and a policy would not be issued." (Dkt. 35 at 7.) Everest further contends that "the option to list Smith and Marsh as excluded drivers presupposes that they were disclosed as required in the first place." (*Id.* at 9.) Everest argues vehemently that they would not have issued a policy if Bryson had truthfully disclosed his roommates on the application form. The facts, however, indicate that Bryson *did disclose* the existence of his roommates

– both to Andrea McGhee when applying for insurance and to the investigator during the post-accident investigation. (Dkt. 24-4 at 5; Dkt. 24-3 at 6.) A reasonable juror could conclude that had Bryson been presented with any opportunity to disclose *and exclude* his roommates, he would have done so. And there is undisputed testimony that, had Bryson disclosed and excluded his roommates, he would have been issued the same coverage with the same premium. (Dkt. 28-6 at 25.)

"[T]he focus of inquiry under the statutory 'materiality' test is whether a reasonable underwriter would have regarded [the applicant's] updated answers . . . as sufficient grounds for rejecting the risk or charging an increased premium." *Oade*, 465 Mich. at 255. In the present case, the Court cannot decide on summary judgment whether *complete* updated answers to the relevant questions related to Bryson's roommates would have resulted in a reasonable underwriter "rejecting the risk" or "charging an increased premium." Everest's presentation of the facts assumes the insurance application afforded Bryson the opportunity to identify and exclude his roommates – and, on that basis, insists that truthful answers to the questions on the application would have resulted in a rejection of the risk. Allstate's presentation of the facts indicates

that, had he been presented with the opportunity to disclose and exclude his roommates, he would have done so – and, on that basis, truthful answers to the questions on such an application would have resulted in Everest accepting the risk by issuing substantively the same policy with the roommates listed as excluded drivers. Because "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment must be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## IV.   Conclusion

Accordingly, cross-defendant Everest's motion for summary judgment is DENIED.

IT IS SO ORDERED.


Dated: August 16, 2018          s/Judith E. Levy
Ann Arbor, Michigan             JUDITH E. LEVY
                                United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 16, 2018.

s/Shawna Burns
SHAWNA BURNS
Case Manager